UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| DANIEL TODD AUGUSTINE, | 4:20-CV-04072-KES |
| Plaintiff, | |
| vs. | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| SAVANNAH PITCHFORD, Captain/Officer in charge, in her individual capacity, DARIN YOUNG, Chief Warden, in his individual capacity, JESSICA COOK, Facility Warden, in her individual capacity, JESSICA SCHREURS, Director of Nursing/RN, in her individual capacity, DERRICK BIEBER, Unit Manager, in his individual capacity, | |
| Defendants. | |

Plaintiff, Daniel Todd Augustine, filed a pro se civil rights lawsuit under 42 U.S.C. § 1983. Docket 1. Augustine's claims against defendants in their official capacities were dismissed in this court's screening order. Docket 5 at 8. Now, defendants move in their individual capacities for summary judgment based on qualified immunity and for a protective order. Dockets 26, 35.

## I.  Defendants' Motion for Summary Judgment

### A.  Factual Background

Viewing the evidence in the light most favorable to Augustine, as the

non-moving party, the facts are:[1] Augustine sustained an "open wound" while doing burpees during recreation time at the South Dakota State Penitentiary (SDSP) on January 23, 2020. Docket 32 ¶¶ 2, 20. He waited two days before reporting his injury to Health Services. *Id.* ¶ 11. When he did report the injury, he described it as a "zit/blister" and "pop[ped]" it. *Id.* ¶ 12. Augustine showed the injury to Health Services staff and they "cultured [his] wound and dressed it." *Id.* ¶ 13 (brackets in original). Augustine claims that when he entered Health Services, he was met with laughter, profanity, and snide comments. Docket 40-1 at 8. Health Services instructed Augustine on how to use warm packs. Docket 32 at ¶ 15. He was advised to keep the area dry and clean. *Id.* ¶ 16. He was also instructed on how to engage in proper hand washing to reduce the chance of infection. *Id.* On January 25, 2020, the same day Augustine reported his injury, Health Services took a culture of the injury and he was instructed to return if the injury worsened. *Id.* ¶¶ 17-18. A lab culture typically takes a minimum of forty-eight hours for the results to become apparent. *Id.* ¶ 19.

On January 26, 2020, Augustine was prescribed ibuprofen and acetaminophen as well as ciprofloxacin and he was again instructed on how to

---

[1] Because defendants move for summary judgment, the court recites the facts in the light most favorable to Augustine. Where the facts are disputed, both parties' averments are included. Under Local Civil Rule 56.1(D), "All material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's response to the moving party's statement of material facts." Augustine filed a "statement of disputed factual issues." Docket 40. Augustine's disputed facts do not align with the specific number of defendants' undisputed facts, but this court will consider Augustine's disputed factual issues, and liberally construes the document as an affidavit. *Compare* Docket 32 *with* Docket 40.

2

care for the injury. *Id.* ¶¶ 21-22, 25. Later that day, Augustine asserts that he experienced severe pain that caused him to hold his breath. Docket 40-1 at 8. Augustine reported shortness of breath and Physician Assistant Alyssa Welbig gave a verbal order for an EKG. Docket 32 ¶ 27. Augustine claims Welbig told him to "stop hyping it up . . . ." Docket 40-1 at 8. On the evening of January 27, 2020, Augustine went to Health Services and complained of an infection of his right knee. Docket 32 ¶ 28. His knee was examined and the "knee revealed that it was 'red, swollen and ha[d] a center site, serosanguinous fluid on band-aid about half centimeter in circumference.' " *Id.* (quoting Docket 29 ¶ 19). Augustine asserts that Health Services said there was nothing they could do and when he asked about E-Care, Amanda said "she wasn[']t going to waste the time." Docket 40-1 at 8. The Nursing Staff chose to schedule a sick call with a provider. Docket 32 ¶ 29. Augustine was "upset he was not being sent out" and walked away without taking any medication. *Id.* (quoting Docket 29 ¶ 20). A provider reviewed Augustine's lab results on January 27, 2020, and did not issue a new order. *Id.* ¶ 30. Augustine was seen three times by Health Services on January 27, 2020. Dockets 27-5, 27-11, 27-13.

Later that evening, Augustine pushed the emergency call button in his cell and claimed that he could not move and that the pain had spread to his abdomen and groin. *Id.* ¶ 31. Officers allege that they said Augustine should be seen by Health Services. *Id.* ¶ 32. Officer Pitchford was in charge the evening that Augustine activated his emergency call button in his cell. *Id.* ¶ 40. Pitchford contacted Health Services but they advised her that it was not necessary to see

3

Augustine at that time because he had been seen earlier that day. *Id.* ¶ 41. Pitchford relied on what Health Services told her and believed it was not a medical emergency. *Id.* ¶ 43. She informed Augustine he would have to wait until the morning to be seen by medical staff. *Id.* Augustine claims that the denial to be seen by Health Services after he pushed the emergency call light was a "denial of treatment . . . [that] violated his [Eighth] Amendment right[] to be free of cruel and unusual punishment . . . ." Docket 40-1 at 2. Augustine claims Pitchford directly participated in this alleged denial of medical treatment and that she had "every opp[ortunity] to intervene as her rank of Captain gave her power to have him evaluated[,] yet she failed to act when the law required her to do so." Docket 40 ¶ 7.

On January 28, 2020, Augustine claims that his symptoms were agonizing, and he asked about being provided a wheelchair. Docket 40-1 at 9. Augustine went to Health Services and insisted on being provided a wheelchair. Docket 32 ¶¶ 48-49. Dr. Sultana, the provider at the time, denied Augustine's request and stated that Augustine would be fine with crutches. *Id.* ¶ 49. Augustine threw his crutches down and walked out of the clinic. *Id.* ¶¶ 50-51. Unit Manager Derrick Bieber spoke with Augustine about the wheelchair request and he called Health Services but was told that Augustine was fine with crutches. *Id.* ¶¶ 52-53. Because Augustine had left his crutches at Health Services, he needed a way to get his crutches. Docket 40-1 at 9. He claims that officers refused to bring him his crutches and would not allow other inmates to get the crutches for him. *Id.* Inmates tried to help Augustine because he was in

4

severe pain. *Id.* Bieber spoke with Augustine about the wheelchair and he called Health Services but was told that Augustine was fine with crutches. Docket 32 ¶¶ 52-53.

On January 28, 2020, the lab results came back indicating the culture had developed "Staphylococcus Aureus- MRSA." *Id.* ¶¶ 57-58. Augustine's treatment was changed and he was prescribed a common antibiotic prescribed to treat infection, sulfamethoxazole trimethroprim. *Id.* ¶ 61. He was also prescribed an antibiotic ointment. *Id.* ¶ 62. Health Services saw Augustine again on January 29, 2020. *Id.* ¶¶ 63, 66. At this time, his symptoms were "much worse" and his right knee had doubled in size compared to his left knee. *Id.* Augustine claims that the wound was black in color. Docket 40-1 at 9. At this point, Augustine claims that he could not stand up without burning pain and he had pain in his toes and abdomen. *Id.* at 10.

Health Services noted that streaking was present and it was concerned about a bone infection. Docket 32 ¶ 67. Health Services then called Avera McKennan Emergency Department (ED) to coordinate transportation. *Id.* ¶ 67. When Augustine was seen at the ED, he informed the physician that he was "doing burpees on the gym floor on 1.23.20 and sustained a small scrape" and later pulled off a blister over the region. *Id.* ¶ 68. The staff in the ED described Augustine's injury as a "superficial injury to his knee" that "got secondarily infected" when he opened the blister. *Id.* ¶ 69. The Acute Operative Report (Report) indicated that Augustine had "[s]eptic prepatellar bursitis of [the] right knee." Docket 27-146 at 1. The Report noted that although Augustine was on

antibiotics, his leg did not improve and became more painful. Docket 32 ¶ 70. Augustine agreed with the orthopedic plan to have his right knee drained. *Id.* ¶ 73. An MRI was performed and there was "[n]o evidence of osteomyelitis or synovitis." *Id.* ¶ 77. The incision and drainage (I&D) was performed on January 30, 2020, and no further surgeries were ordered at that time. *Id.* ¶¶ 78, 80.

On February 1, 2020, even though Augustine complained of pain in his calf and foot, Avera McKennan's plan was to discharge Augustine back to prison because complications from surgery were not seen and medication was issued. *Id.* ¶¶ 82-83. Dr. Krjaca indicated that Augustine's discharge plan of care included:

> [t]wice daily dressing changes to the right knee. Iodoform half-inch gauze packing followed by dry dressings and an Ace wrap. The more superior incision should have the gauze pack laterally and the more inferior incision gauze packed medially. Remove the packing prior to showering in the morning, replace packing and dressings after showering.

Docket 27-146 at 2. Augustine returned to SDSP on February 2, 2020 and did not voice any concerns. *Id.* ¶ 84. Augustine claims that when he returned to the SDSP that he chose to go back to his cell because he was afraid of mistreatment "at the hands of the state . . ." and that Dr. Sultana attempted to reduce his medication order. Docket 40-1 at 10-11. Augustine's Treatment Plan signed by "AREINDERS" was identical to Dr. Krajca's order stated above. *Compare* Docket 27-146 *with* Docket 27-27. Augustine was proscribed doxycycline (for infection), hydrocortisone cream (for infection), tramadol, and hydrocodone (for pain relief). *Id.* ¶ 86-87; Dockets 27-30, 27-32, 27-34, 27-38.

6

On February 2, 2020, a week after his discharge from Avera McKennan, Health Services scheduled Augustine to be seen by the on-site provider. Docket 32 ¶ 88. Jessica Schreurs is "employed as Director of Nursing/RN at South Dakota State Penitentiary." Docket 16 ¶ 8.[2] Augustine claims that from February 2-8, 2020, Schreurs and Health Service Nurses used expired iodoform strips to pack his wounds and he brought it to the nurses' attention on February 8, 2020. Docket 40-1 at 11.

On February 3, 3030, Dr. Sultana gave a verbal order to discontinue the dose of tramadol and Hydro/APAP but ordered that Augustine start "HYDROC/APAP" AND "TRAMADOL." Docket 27-42. A treatment note stated that the wound must be monitored for infection. Docket 27-43. Because of pain, Augustine refused to allow nurses and doctors to change the dressing or examine his leg. Docket 32 ¶¶ 96-99; Docket 27-45. Later that day, Health Services was able to conduct a wound assessment and Augustine was told to notify Health Services if he experienced any "redness, warmth or unusual drainage from the site." Docket 32 ¶ 101; *see* Docket 27-44. When Augustine

---

[2] Defendants cite to an affidavit of Schreurs in their statement of undisputed facts. *See* Docket 32 ¶ 273. This affidavit has not been filed with the court. A statement of undisputed fact must be supported by "citing to particular parts of material in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." *Id.* at 56(c)(3). This court will consider the fact asserted in defendants' answer regarding Schreurs's employment status. This court cannot consider the asserted undisputed fact that as the Director, Schreurs was not involved in the day-to-day care decisions regarding Augustine's treatment, because that alleged fact is not supported by material within the record.

returned that evening and was concerned about how his foot was feeling, the Nursing Staff arranged for an "Avera E-Care" visit. Docket 32 ¶ 102. The outside provider on the E-Care visit recommended that if Augustine had "any worsening erythema or has a fever greater than 100.5F, he needs to be seen in the ER." *Id.* ¶ 104.

On February 4, 2020, when Augustine was seen by Health Services to assess his wound care and mobility, Augustine asked about being discharged from the Infirmary. *Id.* ¶ 106, 108. After being warned about the chance of infection and that he would need to sign a release of responsibility if he left, he agreed to stay in the Infirmary. *Id.* ¶¶ 106-07. Augustine's wound dressing was changed and repacked. Docket 27-58. On February 6, 2020, Augustine was warned about the risk of reinfection when he was "visualized after shower wiping blood from his knee with [the] bottom of his hospital pants." Docket 32 ¶¶ 111-13. Later, Augustine reported a numbness in his right foot and his foot was cool to the touch but there were no signs/symptoms to believe an infection was present. *Id.* ¶¶ 114-16. Augustine requested that his dressing be changed only after he took his pain medication. Docket 27-59.

On February 9 and 10, 2020, he reported burning under the skin of his knee and numbness of his foot. Docket 32 ¶¶ 121-126. Augustine described his pain as an 8 out of 10 even while taking prescription pain medication, and an x-ray was ordered. *Id.* ¶¶ 127-28. A Wound Nurse Treatment Plan stated that the new instruction was to place an "ABD pad covered with Kerlix and wrap[] with [an] ace bandage . . . ." Docket 27-70. Augustine claims that he pressed his call

8

light and no one responded to him to bring his pain medication and this amounted to a delay in his treatment. Docket 40-1 at 11.

In a February 10, 2020 meeting with Health Services, Augustine asserted that he did not trust the care he was receiving and that he wanted to hear from the surgeon about how his wound was doing. Docket 32 ¶¶ 130-31. A treatment note was entered to schedule an appointment with a provider "regarding concerns to patient's right knee." Docket 27-78. On February 11, 2020, Augustine allegedly told Health Services that because his knee hurt badly, he wanted to delay his dressing change but was later seen laughing and talking on his Ipad. Docket 32 ¶¶ 132-36. The Encounter Notes filed by Nurse Katie DeNeui on February 11, 2020, reported that Augustine's dressings were changed and that the "[o]uter open wound was [not] packed with 20 cm of iodoform due to being out. More was ordered for second dressing change. Patient educated of this and was okay with plan of care." Docket 27-77.[3]

An x-ray was ordered on February 12, 2020, and during the x-ray, Augustine refused to extend his leg into proper positioning and the x-ray showed an issue not previously seen but that it was "nonspecific." *Id.* ¶¶ 142-43; Docket 27-82. On February 13, 2020, Health Services called Dr. Krajca's nurse to schedule a follow-up, but the nurse reported that Dr. Krajca did not need to see Augustine in the clinic but that he could be seen by a provider at

---

[3] The court is unsure whether this note should have said that the wound was *not* packed due to being out of iodoform. The Encounter Note supports that because the Infirmary was out of iodoform the wound was not packed. *See* Docket 27-77.

SDSP. *Id.* ¶ 146. On the same day, an Encounter Note written by Nurse Christine Scovill reported that Augustine's dressing was changed but it did not address whether Augustine's wound was packed as ordered by the ED Doctor. Docket 27-85. At the Tele-Health follow-up, the Infectious Disease Doctor, Dr. Diaz, was concerned about the lack of resolution of Augustine's infection and the discharge from the wound. Docket 32 ¶¶ 147-48. Health Services ordered Augustine to be transported to Avera McKennan Hospital. *Id.* ¶ 152. At the hospital, a CT scan and blood cultures were ordered. *Id.* ¶¶ 157-58. The ED Visit Notes state that Augustine reported to be in extreme pain, and that he had lost 12 pounds since the infection started. Docket 27-90. On February 13, 2020, Doctor Jabbour Bassel diagnosed Augustine to have a "[r]ight knee prepatellar bursitis infection secondary to MRSA with overlying cellulitis." Docket 27-91. Doctor Asma S. Syed reported that:

> [o]n discussion with orthopedics there was noticed to be a large amount of packing present*, which was causing significant inflammation and had been in there for about 2 days.* He is supposed to get his packing changed twice a day, and everyday. And the instructions were given to them during my visit with him.

Docket 27-92 (emphasis added). Orthopedic Surgery and Infectious Disease Doctors determined that Augustine did not need an operation or additional antibiotics. Docket 32 ¶¶ 159-60. Augustine was discharged with a regimen of 600 mg of ibuprofen every 6 hours. *Id.* ¶ 160. Dr. Carpenter did not agree with the Hospital assessment that the packing had been in for two days prior to coming to the hospital. *Id.* ¶¶ 161-162. In Dr. Carpenter's "professional medical judgement," Augustine's medical records "clearly suggest[] that he was feigning

10

symptoms of pain and being ill" because he reported to be in pain but individuals saw him being active (playing basketball etc). *Id.* ¶ 176

On February 22, 2020, Augustine was sent back to the ER when he started experiencing abdominal pain. Docket 27-102 at 1. The Radiology Details state that Augustine's CT of his abdomen looked normal, and his lab work was normal. *Id.* at 5. Doctor Peter W. Levasseur stated that "[t]he lack of any findings whatsoever are concerning that these are factitious symptoms and possibly drug-seeking behavior." *Id.* at 5.

Orthopedic Surgeon, Dr. Krajca, saw Augustine on March 3, 2020, after Augustine complained of heavy yellow/brown discharge, but Dr. Krajca reported that the incision was healing well and was without drainage. Docket 32 ¶¶ 180-81. Dr. Krajca also reported that there were no signs of infection and only mild swelling. *Id.* ¶ 182. Augustine had a follow up appointment with an Infectious Disease Specialist on March 4, 2020. *Id.* ¶ 188. The Specialist noted a small amount of drainage, and activity and range of motion were normal. *Id.* ¶ 188. Augustine was seen by Health Services on March 5-12, 2020. *Id.* ¶¶ 188-193, 199-208. Augustine started physical therapy on March 10, 2020, to work on weight bearing and range of motion. *Id.* ¶¶ 194-195.

On March 26, 2020, Augustine was seen by a provider due to swelling and discoloration, and an x-ray was ordered. *Id.* ¶ 210. The provider prescribed a knee brace. *Id.* ¶ 212. Another x-ray was taken on March 30, 2020, and it revealed no fractures, dislocations, or evidence of osteomyletis. *Id.* ¶ 213. Augustine was seen walking without difficulty and running in a hallway. *Id.*

11

¶ 214. Augustine complained about burning in his right knee, but assessments showed normal range of motion and ability to walk. *Id.* ¶¶ 229-30. An x-ray revealed no abnormalities. *Id.* ¶ 245.

**B.  Legal Standard**

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or by showing that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To avoid summary judgment, "[t]he nonmoving party may not rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (internal quotation omitted). The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine issue of material fact." *Id.* at 247-48 (emphasis omitted).

Essentially, the availability of summary judgment turns on whether a proper jury question is presented: "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved . . . in favor of either party." *Id.* at 250. Prisoners who proceed pro se are entitled to the benefit of liberal construction at the pleading stage. *Quam v. Minnehaha Cty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987). Nonetheless, the summary judgment standard set forth in Rule 56 of the Federal Rules of Civil Procedure remains applicable to prisoners proceeding pro se. *Id.* The district court is not required to "plumb the record in order to find a genuine issue of material fact." *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996).

Courts must remain sensitive, however, "to the special problems faced by prisoners attempting to proceed pro se in vindicating their constitutional rights, and [the Eighth Circuit does] not approve summary dismissal of such pro se claims without regard for these special problems." *Nickens v. White*, 622 F.2d 967, 971 (8th Cir. 1980). "[W]hen dealing with summary judgment procedures technical rigor is inappropriate where . . . uninformed prisoners are involved." *Ross v. Franzen*, 777 F.2d 1216, 1219 (7th Cir. 1985).

### C.  Legal Analysis

Defendants argue that they are entitled to qualified immunity because their actions did not amount to constitutional violations. *See* Dockets 26, 27.

To determine whether a government official is entitled to qualified immunity, the court asks: (1) whether the facts alleged, viewed in the light most favorable to plaintiff, demonstrate the official's conduct violated a constitutional right, and (2) whether the constitutional right was clearly established at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court may address the elements in any order and if either of the elements is not met, then the official is entitled to qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"Defendants readily acknowledge that Inmate Augustine has a 'well-established right not to have known, objectively serious medical needs disregarded.' " Docket 27 at 5 (quoting *Fourte v. Faulkner Cnty., Ark.*, 746 F.3d 384, 387 (8th Cir. 2014)). Because defendants do not dispute that the constitutional right was clearly established, this court will only address whether Augustine has demonstrated that defendants' alleged conduct amounted to a constitutional violation.

To be successful on an Eighth Amendment claim, Augustine must demonstrate: "(1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Dulany v. Carnahan*, 132 F.3d. 1234, 1239 (8th Cir. 1997) (internal citations omitted). Medical needs must be serious and "[t]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge."

14

*Id.* "In determining whether the inmate has an objectively serious medical need, . . . the need or the deprivation alleged must be *either obvious to the layperson* or supported by medical evidence, like a physician's diagnosis." *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999) (internal citations omitted and italics in original). Defendants do not specifically contest that Augustine had a serious medical need. *See* Docket 27 at 6.

To demonstrate deliberate indifference, "[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Estate of Rosenberg v. Crandell,* 56 F.3d 35, 37 (8th Cir. 1995)). "Deliberate indifference may be manifested by prison doctors in responding to the prisoner's needs or by prison officials in intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment." *Meloy v. Bachmeier,* 302 F.3d 845, 849 (8th Cir. 2002) (citing *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976).

"A plaintiff can show deliberate indifference in the level of care" by: (1) "showing grossly incompetent or inadequate care[;]" (2) "showing a defendant's decision to take an easier and less efficacious course of treatment[;]" or "showing a defendant intentionally delayed or denied access to medical care." *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015) (internal citations omitted).  "Medical care so inappropriate as to evidence intentional

maltreatment or a refusal to provide essential care violates the [E]ighth [A]mendment." *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990).

For a delay in treatment claim, the court will measure the objective seriousness of the alleged deprivation with reference to the effect of the delay. *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997) (holding that there was not a violation of the Eighth Amendment when inmate failed to submit medical evidence to support that the delay in receiving sunglasses had an adverse effect or caused further damage to his eye). In order to support a delay in medical treatment claim the inmate "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Id.* (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994)).

### 1. Defendants Darin Young and Jessica Cook

Defendants argue that Chief Warden Darin Young and Facility Warden Jessica Cook were not involved in the alleged violations. Docket 27 at 26. In an individual capacity suit under § 1983, a plaintiff seeks to impose personal liability on a state actor for actions taken under color of state law. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978). Only state actors whose personal conduct caused the deprivation of a federal right are liable under § 1983. *Pulaski Cnty. Republican Comm. v. Pulaski Cnty. Bd. of Election Comm'rs.*, 956 F.2d 172, 174 (8th Cir. 1992) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). A person must have been "personally involved or had direct responsibility" in the alleged violation in order to establish liability under

16

§ 1983. *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985). The record does not include alleged facts about Young and Cook. *See* Dockets 32, 40. Further, "a general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995). Augustine has failed to raise of genuine issue of material fact that Young and Cook were personally involved in his alleged constitutional violations. Thus, Young and Cook are entitled to summary judgment based on qualified immunity.

### 2.   Defendant Savannah Pitchford

Augustine claims that Pitchford denied and delayed his treatment. See Dockets 40 ¶ 7, 40-1 at 2. On the evening of January 27, 2020, Pitchford was the officer in charge when Augustine pushed his emergency call button. Docket 32 ¶¶ 31, 40. Augustine claimed that he could not move, and the pain had spread to his groin and abdomen. *Id.* ¶ 31. After Augustine pushed the button, Pitchford contacted Health Services and was advised that Augustine did not need to be seen at that moment and that he could wait until the morning. *Id.* ¶ 41. Pitchford relied on what Health Services told her and believed it was not a medical emergency. *Id.* ¶ 43. She informed Augustine he would have to wait until the morning to be seen by medical staff. *Id.*

Augustine claims that the denial to be seen by Health Services after he pushed the emergency call light was a "denial of treatment . . . [that] violated his [Eighth] Amendment right[] to be free of cruel and unusual punishment . . . ." Docket 40-1 at 2. Augustine claims Pitchford directly

participated in this alleged denial of medical treatment and that she had "every opp[ortunity] to intervene as her rank of Captain gave her [the]power to have him evaluated[,] yet she failed to act when the law required her to do so." *Id.* ¶ 7.

Augustine must assert alleged facts that show Pitchford "intentionally . . . denied access to medical care . . . ." *Allard v.* 779 F.3d at 772. Here, Pitchford relayed information from Health Services to Augustine. Docket 32 ¶ 43. The record shows that Augustine had been receiving medical care up to this point—cultures were taken for a lab test, he was given medication and ointment for his injury, and his wound was dressed. *Id.* ¶¶ 13, 17-18, 21-22, 25. On January 27, 2020, Augustine was seen by Health Services at 11:35 AM, 2:49 PM, and 8:41 PM. Dockets 27-5, 27-11, 27-13. Augustine had already been seen three times that day. Dockets 27-5, 27-11, 27-13. It appears the issue is not that Augustine was denied medical care, but that he was denied *additional care* that he believed was necessary.

In *Plemmons v. Roberts*, defendants were not entitled to qualified immunity when they did not immediately call for medical assistance after the inmate told them he had a history of heart attacks and was experiencing arm pain, chest pain, nausea, and profuse sweating. 439 F.3d 818, 824 (8th Cir. 2006). Here, Pitchford promptly acted after Augustine pushed his emergency call light and she contacted Health Services. Docket 32 ¶ 43. "Prison officials lacking medical expertise are entitled to rely on the opinions of medical staff regarding inmate diagnosis and the decision of whether to refer the inmate to

18

outside doctors . . . ." *Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011).
Further, a disagreement of treatment decisions does not amount to a
constitutional violation. *Jolly*, 205 F.3d at 1096. Because Pitchford relied on
the decision of Health Services, there is not a genuine issue of material fact
that Pitchford denied Augustine medical care.

Pitchford's actions also do not amount to a delay in treatment because
Augustine has not placed medical evidence into the record to establish that the
delay of not being seen for the fourth time in one day established a "detrimental
effect" to his condition. *See Crowley*, 109 F.3d at 502. The cultures for the lab
were taken on January 25, 2020 (the day Augustine reported his injury to
Health Services), and the results came back on January 28, 2020 (the day after
Augustine pushed his emergency call button). Docket 32 ¶¶ 57-58. As soon as
the lab results came back, the treatment plan changed to treat the infection. *Id.*
¶ 61. On January 29, 2020, Augustine was sent to the Emergency Room when
his symptoms became worse. *Id.* ¶¶ 63, 66-67. Augustine has not established
that the delay of not being seen in the evening on the August 27, 2020, had a
detrimental effect on his condition. Pitchford relied on the medical expertise of
Health Services to not seek treatment the night of August 27, 2020. *Id.* ¶ 43.
Thus, Pitchford's motion for summary judgment based on qualified immunity is
granted.

### 3.   Derrick Bieber

Augustine claims that Unit Manager Bieber denied him medical care.
Docket 40-1 at 8. On January 28, 2020, Augustine asked to be provided with a

wheelchair. Docket 32 ¶¶ 49-49. Dr. Sultana denied his request and said that

Augustine would be fine on crutches. *Id.* ¶ 49. Augustine threw his crutches

down and walked out of the clinic. Docket 32 ¶ 50-51. Bieber spoke with

Augustine about the wheelchair and he called Health Services but was told that

Augustine was fine with crutches. *Id.* ¶¶ 52-53. Bieber's reliance on the answer

from Health Services does not constitute a denial of medical treatment. *See*

*Holden*, 663 F.3d at 343. Bieber, without medical expertise, was merely

inquiring and relaying the information to Augustine. Thus, Bieber is entitled to

summary judgment based on qualified immunity.

### 4.  Jessica Schreurs

Defendants assert that Schreurs was not personally involved in the

alleged constitutional violations. Docket 27 at 26. Augustine claims that

Schreurs was personally involved in using expired iodoform strips to pack his

wound and is responsible for the Nursing Staffs' actions. *See* Docket 41-8. The

Eighth Circuit has found that under § 1983:

> A supervisor cannot be held liable for an employee's
> unconstitutional actions based on a theory of respondeat superior.
> Rather, a supervisor incurs liability for a violation of a federally
> protected right when the supervisor is personally involved in the
> violation or when the supervisor's corrective inaction constitutes
> deliberate indifference toward the violation. The supervisor must
> know about the conduct and facilitate it, approve it, condone it, or
> turn a blind eye for fear of what [he or she] might see.

*Ottman v. City of Independence, Mo.*, 341 F.3d 751, 761 (8th Cir. 2003)

(alteration in original) (citation and internal quotations omitted). "[A] supervisor

can act with 'deliberate, reckless indifference' even when he does not act

20

'knowingly.' " *Kahle v. Leonard*, 477 F.3d 544, 551-52 (8th Cir. 2007) (quoting *Farmer*, 511 U.S. at 842).

The court must establish whether there is a genuine issue of material fact that an Eighth Amendment violation occurred because a supervisor is only liable when they were "involved in the violation . . . ." *Ottman*, 341 F.3d at 761. Because Schreurs is the Director of Nursing, the court will confine its analysis to the alleged actions of Nursing Staff and the allegations against Schreurs personally. A plaintiff can show deliberate indifference by "showing a defendant's decision to take an easier and less efficacious course of treatment . . . . " *Allard*, 779 F.3d at 772.  Dr. Krajca ordered that Augustine's discharge plan of care include:

> [t]wice daily dressing changes to the right knee. Iodoform half-inch gauze packing followed by dry dressings and an Ace wrap. The more superior incision should have the gauze pack laterally and the more inferior incision gauze packed medially. Remove the packing prior to showering in the morning, replace packing and dressings after showering.

Docket 27-146 at 2. Health Services' treatment order followed the Hospital discharge plan. *See* Docket 27-7. Augustine claims that on February 2-8, 2020, Schreurs and Health Services' nurses used expired iodoform strips to pack his wounds. Docket 40-1 at 11. In the Encounter Notes from February 11, 2020, Nurse Katie DeNeui reported that Augustine's dressings were changed and that the "[o]uter open wound was [not] packed with 20cm of Iodoform due to being out. More was ordered for second dressing change. Patient educated of this and was okay with plan of care." Docket 27-77.

21

On February 13, 2020, an Encounter Note written by Nurse Christine
Scovill reported that Augustine's dressing was changed but the report does not
indicate that the wound was packed. Docket 27-85. Further, when Augustine
was seen in the ED for the second time, Doctor Asma S. Syed reported that:

> [o]n discussion with orthopedics there was noticed to be a large
> amount of packing present, *which was causing significant
> inflammation and had been in there for about 2 days.* He is supposed
> to get his packing changed twice a day, and everyday. And the
> instructions were given to them during my visit with him.

Docket 27-92 (emphasis added). At this time, there is genuine issue of material
fact as to whether Nursing Staff were deliberately indifferent to Augustine's
serious medical need by choosing a less efficacious treatment route—by
allegedly using expired iodoform packing strips, by not packing the wound as
required, and by not removing old packing in the wound that caused severe
inflammation. Dockets 27-77, 27-85, 27-92.[4] Augustine has raised a genuine
issue of material fact about whether Schruers, as the Director of Nursing, knew
about this conduct, approved it, condoned it, or turned a blind eye from the
conduct. *See Ottman*, 341 F.3d at 761. Thus, Schruers is not entitled to
summary judgment based on qualified immunity. If defendants or Augustine
move for summary judgment at a later date, Augustine must present evidence
of Schruers personal involvement and/or evidence that she condoned the
actions, helped facilitate the actions, or approved the actions.

---

[4] Augustine did not sue a particular nurse on the nursing staff. He has access
to nurses' names on the encounter or treatment notes.

## II.      **Motion for a Protective Order**

Defendants move for a protective order asking that discovery be stayed until the resolution of their motion for summary judgment. Docket 35. Because this court has ruled on their motion for summary judgment, their motion for a protective order (Docket 35) is denied as moot.

Thus, it is ORDERED:

1. That Defendants' motions for summary judgment (Docket 26) is granted in part and denied in part. Defendants Darin Young, Jessica Cook, Savannah Pitchford, and Derrick Bieber are entitled to summary judgment based on qualified immunity. Defendant Jessica Schreurs's motion for summary judgment based on qualified immunity is denied.

2. That Defendants' motion for a protective order (Docket 35) is denied as moot.

Dated: June 14, 2021

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE